**AIR PRODUCTS AND CHEMICALS, INC., Appellant,**

v.

**ODFJELL SEACHEM A/S, Odfjell Asia II Pte. Ltd., and Odfjell Singapore Pte. Ltd., Appellees.**

**No. 01–08–00591–CV.**

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 27, 2009.

Anthony J. Pruzinsky, Pro Hac Vice, Dana Keith Martin, Hill Rivkins & Hayden, L.L.P., Houston, TX, for Appellant.

William A. Durham, Eastham, Watson, Dale & Forney, Houston, TX, for Appellees.

Panel consists of Justices JENNINGS, KEYES, and HIGLEY.

## OPINION

TERRY JENNINGS, Justice.

Appellant, Air Products & Chemicals, Inc. ("AP"), challenges the trial court's judgment entered in favor of appellees, Odfjell Seachem A/S, Odfjell Asia II Pte. Ltd., and Odfjell Singapore Pte. Ltd. (collectively "Seachem"), after a jury trial, in AP's suit against Seachem for Seachem's alleged negligence in discharging hazardous chemicals from its vessel, the *Bow Favour*, into a storage tank in which AP stored other product. In four issues, AP contends that the trial court erred in denying its motion to amend its pleadings "with respect to the issue of negligence per se," not instructing the jury on negligence per se, not rendering a judgment notwithstanding the verdict in favor of AP on negligence per se, admitting the hearsay testimony of the first officer of the *Bow Favour* "concerning what he was told by another crewman," and instructing the jury to apportion liability between Seachem and a defendant with which AP had settled prior to trial.

We affirm.

## Factual and Procedural Background

In its fourth amended petition, AP alleged that the Odfjell Terminals (Houston), L.P. and Odfjell Terminals USA, G.P., Inc. (collectively "OTH") operated a terminal and tank farm business in Seabrook, Texas at which AP stored hazardous chemicals referred to as "MIPA–70." AP further alleged that on March 11, 2005, Seachem, the owner and operator of the *Bow Favour* discharged other chemicals, referred to as "DCPD," from the *Bow Favour* into a line and shore tank containing AP's MIPA–70, causing contamination of AP's product. AP sued both OTH and Seachem, asserting that they were negligent in loading, segregating, handling, and storing the products and that their negligence caused the contamination. AP also sued OTH for breaching the parties' con-

tract relating to the storage of AP's product.

AP and OTH subsequently entered into a settlement. AP and Seachem then proceeded to a jury trial on AP's negligence claim against Seachem. On April 21, 2008, five days after the start of the jury trial, AP filed a motion for leave to file a fifth amended petition, seeking to add allegations of negligence per se against Seachem. The trial court denied AP's motion for leave to add the negligence per se allegations.

At the conclusion of trial, the trial court asked the jury,

Did the negligence, if any, of those named below proximately cause the contamination in question?

    a.  Terminal [OTH]

    b.  Bow Favour [Seachem]

The jury answered "Yes" as to OTH and "No" as to Seachem. Pursuant to the instructions in the jury charge, the jury did not answer any additional questions. In accord with the jury's verdict, the trial court then entered a take-nothing judgment in favor of Seachem and against AP.

### Amendment of Pleadings

█ In its first issue, AP argues that the trial court erred in denying its motion to amend its pleadings "with respect to the issue of negligence per se" because it elicited testimony at trial showing that Seachem had violated two United States Coast Guard Regulations and Seachem did not demonstrate any surprise or prejudice arising from these proposed amendments. AP, citing *Zavala v. Trujillo*, argues that the trial court should have granted the amendments because the negligence per se allegations did not state a new cause of

action. 883 S.W.2d 242, 245 (Tex.App.-El Paso 1994, writ denied).

When AP filed its motion for leave to file a fifth amended petition,[1] AP argued that the amendments were mandatory and the addition of the negligence per se allegations did "not constitute the addition of a new cause of action" because negligence per se is "merely one method of proving the breach of duty required in any negligence case." AP further argued that the addition of negligence per se allegations did not cause Seachem to be surprised or prejudiced because allegations that Seachem had violated the regulations had already been made in AP's expert reports, which were provided to Seachem one year prior to trial, as well as in AP's supplemental interrogatory answers, which AP had provided to Seachem a few weeks before trial. AP attached to its motion the proposed fifth amended petition, in which AP included an additional section entitled "negligence per se." Within this proposed, amended section of its petition, AP cited the following regulation:

The person in charge of cargo transfer may not approve or continue cargo transfer unless the following conditions are met:

    . . . .

    (o) He is in effective communication with the transfer terminal.

    (p) The person in charge of the transfer terminal has acknowledged that he is ready to transfer.

46 C.F.R. § 153.975.

AP also cited the following regulation:

(a) No person may connect or disconnect a hose, top off a tank, or engage in any other critical procedures during the transfer operation unless the person in charge, required by

---

1. In this motion, AP also sought to eliminate all causes of action against OTH. The trial court granted this portion of the motion, and this ruling is not at issue on appeal.

§ 156.120(s), supervises that procedure.

(b) No person may start the flow of oil or hazardous material to or from a vessel unless instructed to do so by either person in charge.

(c) No person may transfer oil or hazardous material to or from a vessel unless each person in charge is in the immediate vicinity and immediately available to the transfer personnel.

33 C.F.R. § 156.160.

In response to AP's motion, Seachem asserted that the parties' deadline to amend their pleadings had expired in November 2007. Seachem contended that allowing AP to amend its pleadings in the requested manner would surprise and prejudice it. Seachem noted that if AP had timely pleaded negligence per se upon the specific federal regulations, Seachem would have engaged experts to testify regarding these specific regulations from the perspective of the Coast Guard to explain in detail how Seachem had not violated the regulations. In regard to surprise, Seachem noted that the motion to amend was filed six months after the discovery deadline, and Seachem asserted that it needed an expert to counter the allegations of negligence per se based upon the specific regulations. Seachem invited AP to argue anything that the pleadings supported, and it suggested that AP could even properly argue the regulations to the jury and that the jury could decide whether the regulations, and any violations thereof, supported a general negligence finding. But, Seachem contended that to allow AP to add a specific cause of action, as well as a specific jury instruction, on the issue of negligence per and the specific regulations would cause surprise and prejudice. AP responded that since the parties would be arguing the alleged violations of the regulations to the jury and the violations im-pact on a finding of negligence, it was simply seeking to "conform[ ] the pleadings to the proof."

Parties may amend their pleadings within seven days of the date of trial or thereafter, or after such time as may be ordered by the judge under rule 166, only after obtaining leave from the trial court, which shall be granted "unless there is a showing that such filing will operate as a surprise to the opposite party." TEX.R. CIV. P. 63. During trial, a "court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the allowance of such amendment would prejudice him in maintaining his action or defense upon the merits." TEX.R. CIV. P. 66.

■■■ A trial court's decision on whether to allow the amendment of pleadings is reviewed under an abuse-of-discretion standard. *Perez v. Embree Constr. Group, Inc.,* 228 S.W.3d 875, 882–83 (Tex.App.-Austin 2007, pet. denied) (citing *Ohio Med. Prods., Inc. v. Suber,* 758 S.W.2d 870, 872 (Tex.App.-Houston [14th Dist.] 1988, writ denied)). A trial court has no discretion to refuse the amendment unless (1) the opposing party presents evidence of surprise or prejudice; or (2) the amendment asserts a new cause of action or defense, and thus is prejudicial on its face, and the opposing party objects to the amendment. *Greenhalgh v. Serv. Lloyds Ins. Co.,* 787 S.W.2d 938, 939 (Tex.1990); *Hakemy Bros., Ltd. v. State Bank & Trust Co., Dallas,* 189 S.W.3d 920, 924 (Tex.App.-Dallas 2006, pet. denied). The party opposing the amendment generally has the burden to show prejudice or surprise. *Greenhalgh,* 787 S.W.2d at 939. However, the trial court may conclude that the amendment is, on its face, calculated to surprise or that the amendment would re-

shape the cause of action, prejudicing the opposing party and unnecessarily delaying the trial. *Id.* at 940; *see also Chapin & Chapin, Inc. v. Tex. Sand & Gravel Co., Inc.*, 844 S.W.2d 664, 665 (Tex.1992) (distinguishing between "formal, procedural" amendments that "simply conform[ ] the pleadings to the evidence at trial" and do not result "in surprise or prejudice" and "substantive" amendments that "clearly change[ ] the nature of the trial itself"). In that situation, the opposing party's objection is sufficient to show surprise. *Greenhalgh*, 787 S.W.2d at 940 n. 3.

Here, the trial court, in its scheduling order, set the deadline to amend pleadings in November 2007. On April 16, 2008, the parties commenced the jury trial, which was limited to AP's general negligence cause of action against Seachem. On April 21, 2008, five days after the jury trial commenced, AP, with its motion to amend its pleadings, sought to insert a theory of negligence per se based upon purported violations of specific Coast Guard regulations. Based upon the arguments put forth by AP, the trial court could have reasonably concluded that AP's negligence per se theory was distinct from the other theories that AP had presented in its live petition, which were based upon Seachem's alleged failure to exercise reasonable care and general negligence in the "line-alignment, loading, segregation, handling, and/or storage" of the products at issue.[2] The distinction between AP's proposed negligence per se allegations and those

made by AP in its live petition is further evidenced by the fact that, in addition to this pleading amendment, AP proposed a specific jury question that would have asked the jury to determine whether AP had violated the subject regulations, not whether AP's negligence, i.e., AP's failure to exercise ordinary care in loading or handling the products, had proximately caused the contamination.

As explained by the Texas Supreme Court, "[n]egligence per se is a tort concept whereby a legislatively imposed standard of conduct is adopted by the civil courts as defining the conduct of a reasonably prudent person," and "[i]n such a case the jury is not asked to judge whether or not the defendant acted as a reasonably prudent person would have acted under the same or similar circumstances" because "the statute itself states what a reasonably prudent person would have done." *Carter v. William Sommerville and Son, Inc.*, 584 S.W.2d 274, 278 (Tex.1979). In a negligence per se action, "the trial court merely has the fact finder decide if the tortfeasor committed the act proscribed by the statute and if the act proximately caused injury." *Borden, Inc. v. Price*, 939 S.W.2d 247, 250 (Tex.App.-Amarillo 1997, writ denied). Thus, while negligence per se might be characterized as "merely one method of proving" negligence, and while negligence per se has been determined to be a cause that is not "separate and independent from a common-law negligence

---

**2.** It must be emphasized that, in denying the formal pleading amendment, the trial court did not preclude AP from presenting evidence on the parties' conduct as it related to the cited regulations. In fact, as previously noted, even without this amendment, Seachem invited AP to argue to the jury that the regulations could be relevant to AP's general negligence cause of action. As is discussed in more depth in regard to the jury charge issue, Seachem primarily objected to AP's efforts to

seek and obtain, in the midst of trial, a negligence per se amendment as a basis to request a jury instruction providing that any violation of the cited regulations by Seachem constituted negligence per se. Seachem stressed that AP's efforts would result in surprise and prejudice on the ground that AP sought to alter the standard of care after the parties had already presented evidence in several days of trial.

cause of action," *see Zavala,* 883 S.W.2d at 245, the trial court could have reasonably concluded that the mid-trial addition of AP's negligence per se allegations, based upon the alleged violations of the specific regulations, would result in the reshaping of AP's general negligence cause of action and would cause a delay in the trial proceedings.

*Zavala v. Trujillo,* relied upon by AP, is factually distinguishable, but we also express our disagreement with its broad holding. 883 S.W.2d 242, 245 (Tex.App.-El Paso 1994, writ denied). In *Zavala,* the plaintiff alleged that he sustained injuries while water skiing as a result of the defendant boat owner's negligent operation of the boat and failure to instruct the plaintiff on how to water-ski. *Id.* at 244. The plaintiff made no reference to statutory violations in his petition. *Id.* At trial, in response to the plaintiff's questioning, the defendant agreed that his boat did not have a rear-view mirror and that there was not an observer on the boat when the plaintiff was injured. *Id.* However, the defendant contended that he was able to watch the plaintiff, and he denied that the suggested measures could have prevented the plaintiff's injury. *Id.*

The plaintiff then sought to elicit from the defendant testimony concerning statutory mandates regarding the use of mirrors and observers when towing skiers. *Id.* The defendant objected to any reference to these statutory mandates, and the trial court sustained the objection and denied the plaintiff's request for a trial amendment and jury instruction on negligence per se. *Id.* The court of appeals reversed, holding that the plaintiff's petition, which included "general allegations" of negligence, gave "fair notice that [the plaintiff was] not relying solely on the specific acts pleaded" and that the plaintiff's trial amendment "merely attempted

to specify an act falling under the general allegation of failing to operate the boat in a safe manner." *Id.* at 248. The court in *Zavala* then suggested that the plaintiff also would have been entitled to a jury instruction that the violation of the statute mandating mirrors and observers constituted negligence per se. *Id.* at 249. The court found that the defendant would not be surprised or prejudiced because a trial exhibit list made reference to the Texas Water Safety Act, which included the challenged statutory mandates. *Id.* The court simply discounted the defendant's arguments and his evidence that he would have been prejudiced by the plaintiff's mid-trial attempt to alter the ultimate jury question from one of general negligence to one of negligence per se based upon specific, statutory violations.

Here, unlike in *Zavala,* the trial court did not bar AP from discussing the regulations at trial as potentially relevant to determining whether Seachem was generally negligent. To the extent the holding in *Zavala* merely allowed the plaintiff to introduce and discuss the statutory violations as being potentially relevant to the general negligence allegation, such a holding is unremarkable and is consistent with the trial court's treatment of the instant case. However, as stated above, under certain circumstances, a trial court has the discretion to conclude that a mid-trial attempt to seek a formal trial amendment on the issue of negligence per se, as a means for subsequently requesting a specific negligence per se jury instruction tracking specific regulations, could result in the reshaping of litigation such that it would prejudice and surprise a defendant.

In the instant case, Seachem objected to AP's amendment and argued to the trial court that it was surprised by the amendment and would be prejudiced. Seachem complained that, if the trial court allowed

the amendment, it would need to designate additional witnesses to testify as to the cited regulations and that it would need to conduct additional discovery related to AP's newly asserted claims that Seachem's alleged violations of these specific regulations established negligence as a matter of law. On appeal, Seachem elaborates on its trial court argument, noting that, if the amendment had been allowed, the issues presented to the jury at trial would have been "dramatically different." For example, as Seachem notes, it would have focused and presented additional evidence on whether the *Bow Favour* crew maintained "effective communication" during the cargo transfer and whether the appropriate *Bow Favour* crew member was in the "immediate vicinity," because these are critical statutory terms upon which a negligence per se finding would likely have been based. Seachem further notes that it would have needed to present expert witnesses "to further address the meaning of the regulations" and whether Seachem violated those regulations. Instead, although the parties discussed and presented evidence on the regulations to the jury, Seachem focused its defense on the concepts of ordinary care and negligence. Finally, Seachem notes that, at trial, it would have challenged whether the cited regulations set forth a standard of care that would have allowed for the jury to find that the violation of the regulations qualified as negligence per se.

Thus, the trial court could have reasonably concluded that the amended pleadings, including the negligence per se allegations, would have reshaped the litigation, prejudicing Seachem and possibly delaying the trial, and, thus, the trial court did not abuse its discretion by striking AP's amended petition. *See Perez*, 228 S.W.3d at 882–83 (holding that it was reasonable for trial court to conclude that amendment seeking to add claims for negligence per se and gross negligence to negligence case was calculated to cause surprise and, thus, trial court did not abuse its discretion in striking amended pleading). Accordingly, we hold that the trial court did not abuse its discretion in denying AP's motion to amend its pleadings.

We overrule AP's first issue.

## Jury Instruction

■ In its second issue, AP argues that the trial court erred in not instructing the jury on negligence per se and not rendering a judgment notwithstanding the verdict in favor of AP on the issue of negligence per se because such an instruction was justified by the trial testimony establishing the pertinent regulatory violations and that the absence of such an instruction permitted the jury to "minimize the importance of, or to ignore altogether, relevant regulatory principles."

■ We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard. *Shupe v. Lingafelter*, 192 S.W.3d 577, 579 (Tex.2006). For an instruction to be proper, it must (1) assist the jury; (2) accurately state the law; and (3) find support in the pleadings and the evidence. *Tex. Workers' Comp. Ins. Fund v. Mandlbauer*, 34 S.W.3d 909, 912 (Tex.2000) (citing Tex.R. Civ. P. 278).

AP, in its proposed jury charge filed with the trial court, asked the trial court to submit an instruction that Seachem committed negligence per se by violating the above-identified federal regulations. AP requested that the trial court instruct the jury as follows:

> *The violation of a United States Coast Guard Regulation is negligence in itself.* In that regard, you are instructed

that United States Coast Guard regulations forbid:

 (1) a person in charge of the cargo transfer from approving or continuing the cargo transfer unless he is in effective communication with the transfer terminal;

 (2) a person in charge of the cargo transfer from approving or continuing the cargo transfer unless the person in charge of the transfer terminal has acknowledged that he is ready to transfer;

 (3) a person from connecting or disconnecting a hose during the transfer operation unless the person in charge supervises that procedure;

 (4) a person from starting the flow of [DCPD] to or from a vessel unless instructed to do by either person in charge; and

 (5) a person from transferring DCPD to or from a vessel unless each person in charge is in the immediate vicinity and immediately available to the transfer personnel.

*A violation of any of the above United States Coast Guard Regulations is negligence in itself.*

(Emphasis added.) [3] AP requested a corresponding question requiring the jury to determine if Seachem's negligence, whether by failing to use a high degree of care

or by violating the regulations, proximately caused the contamination. AP's proposed instructions would have allowed the jury to answer "Yes" either by finding that Seachem breached the proposed, defined standard of care, i.e., a high degree of care, or by violating one of the cited federal regulations.[4]

Having held above that the trial court did not abuse its discretion in denying AP's motion to amend its pleadings to add its allegations of negligence per se, we further hold that the trial court did not err in refusing AP's requested jury instruction on the issue of negligence per se, which would have required the jury to find Seachem negligent if it found that Seachem had violated the identified federal regulations. Moreover, having held that the trial court did not abuse its discretion in denying AP's motion to amend its pleadings and in denying AP's requested jury instruction on the issue of negligence per se, we further hold that the trial court did not abuse its discretion in denying AP's motion for judgment notwithstanding the verdict on the issue of negligence per se.[5]

We overrule AP's second issue.

### Hearsay

■ In its third issue, AP argues that the trial court erred in admitting the testimony of the first officer of the *Bow Fav-*

---

**3.** AP also requested that the trial court instruct the jury that Seachem was negligent, outside of any regulatory violation, if it had failed to use a "high degree of care." AP does not complain on appeal about the trial court's refusal to define negligence as the failure to use a "high degree of care" and the trial court's definition of negligence being based upon the exercise of ordinary care.

**4.** However, contrary to its arguments on appeal, in its proposed jury charge, AP did not request an entirely separate question on negligence per se.

**5.** We note that AP does not provide any briefing specifically related to the trial court's denial of its motion for judgment notwithstanding the verdict. In fact, AP's complaint about the trial court's denial of its motion is dependent upon on its argument that it was entitled to amend its pleadings and receive a jury instruction on the issue of negligence per se. To the extent that AP seeks to raise any additional issue regarding its motion for judgment notwithstanding the verdict, we hold that AP has waived any such issue for review. *See* Tex.R.App. P. 38.1(h).

*our* "concerning what he was told by another crewman, who never testified, about the central issue in the case" because the testimony constituted hearsay. AP asserts that the central issue on which Seachem's alleged negligence is based is the "crucial breakdown of communications" between the *Bow Favour* and OTH, which AP contends is "attributable solely" to the crew of the *Bow Favour*. AP asserts that other "witnesses who attended on the dock and were responsible for shoreside activities during the discharge of the DCPD testified that the [*Bow Favour*] had not been instructed to discharge," and "no one from the [*Bow Favour*] communicated with the shoreside personnel" before the discharge. AP complains that, in spite of this testimony, the trial court allowed the admission of the testimony of Jan Hamre, the *Bow Favour's* Chief Officer and "person-in-charge," that his mate on the *Bow Favour* had asserted that OTH shoreside personnel had told him to discharge the DCPD.

Seachem argues that Hamre's testimony was not hearsay because he "was asked about his investigation into the cause of the contamination" and was "permitted to state the basis of his conclusion, which was that [the *Bow Favour*] started discharging as the shore requested." Seachem asserts that Hamre's challenged testimony, based on his perception, was opinion testimony. *See* Tex.R. Evid. 701. Alternatively, Seachem contends that even if the admission of this testimony was in error, Hamre's testimony was cumulative of other evidence and was harmless.

■■■■ We review a trial court's admission or exclusion of evidence for an abuse of discretion. *In re J.P.B.*, 180 S.W.3d 570, 575 (Tex.2005). The erroneous admission of evidence requires reversal only if the error probably caused the rendition of an improper judgment. Tex.

R.App. P. 44.1; *see also Nissan Motor Co. v. Armstrong*, 145 S.W.3d 131, 144 (Tex. 2004). We review the entire record, and we require the complaining party to demonstrate that the judgment turns on the particular evidence admitted. *Id.* The erroneous admission of evidence is harmless if it is merely cumulative. *Armstrong*, 145 S.W.3d at 144; *Corrales v. Dep't of Family & Protective Servs.*, 155 S.W.3d 478, 487 (Tex.App.-El Paso 2004, no pet.) ("Reversible error seldom occurs when the evidence in question is cumulative and not controlling on a material issue dispositive of the case."); *Crosby v. Minyard Food Stores, Inc.*, 122 S.W.3d 899, 904 (Tex. App.-Dallas 2003, no pet.) ("The error is harmless if other competent evidence of the fact in question appears elsewhere in the record."). Whether the erroneous admission of evidence is harmful is more a matter of judgment than precise measurement, and in making that judgment, we may consider the efforts made by counsel to emphasize the erroneous evidence and whether there was contrary evidence that the improperly admitted evidence was calculated to overcome. *Armstrong*, 145 S.W.3d at 144.

At trial, Seachem's counsel asked Hamre whether he believed that the *Bow Favour* was responsible for discharging the DCPD into the wrong tank. Hamre answered, "No," and, in response to further questioning stated, "Because we do it exactly as we was instructed from shore." AP's counsel objected to this latter testimony as hearsay, and the trial court sustained this objection. Seachem's counsel then asserted that Hamre's testimony was not offered to prove "what people told him." Rather, it was offered to explain why he believed that the *Bow Favour* was not at fault. Seachem's counsel explained to the trial court that, as the man responsible for cargo operations on the *Bow Fav-*

*our*, Hamre had a "continuing duty to try and determine if there's some reason that the ship should be responsible for it." AP's counsel contended that Hamre should not be permitted to testify, based on hearsay, that the *Bow Favour* did not do anything wrong. The trial court then made the following statement,

> He said he's the one in charge of the ship, and there's something that happened that he needs to investigate, and then he did an investigation, under the standard rules, or something to that effect, that he would be able to respond to what his investigation showed, if that was his job. So, he's the one in charge. So, he's got to report what happened. So, if that predicate is laid, that question is all right.

The following exchange then occurred:

> [Seachem's counsel]: ... [I]f a problem arises on the ship involving the cargo, what responsibilities, if any, do you have to determine why that problem arose?
>
> [Hamre]: I have to find out what's going on.
>
> . . . .
>
> [Seachem's counsel]: Okay. And when you were advised that there had been a problem of contamination on shore from cargo discharge from the *Bow Favour*, was it your responsibility to determine if the vessel had any involvement in that?
>
> [Hamre]: I go and talk to my second mate about ... what happened.... But nothing have happened on the ship, so—
>
> [Seachem's counsel]: And it's your responsibility to go talk to the second mate to find out, correct?
>
> [Hamre]: Yeah.

. . . .

> [Seachem's counsel]: Upon your investigation, what was the conclusion?
>
> . . . .
>
> [Hamre]: My conclusion was that there was nothing wrong happen—didn't happen anything wrong on the ship.
>
> [Seachem's counsel]: And what did you base that upon?
>
> [Hamre]: Because we had started the load discharging as—
>
> [AP's counsel]: Objection. Hearsay.
>
> [Trial court]: It's overruled.
>
> . . . .
>
> [Hamre]: We have started discharging, *as the shore request*. And, so, I couldn't see anything wrong.

(Emphasis added).

Assuming that the trial court erred in admitting certain portions of Hamre's testimony regarding what his second mate had been told by shoreside personnel on the grounds that the testimony constituted inadmissible hearsay,[6] we must now determine whether the trial court's error in admitting the testimony was harmful. *See* TEX.R.APP. P. 44.1(a). Here, although we agree that there is some conflicting evidence as to whether shoreside personnel had in fact instructed the *Bow Favour* to commence discharge operations, the overwhelming weight of the evidence shows that shoreside personnel with OTH did instruct the *Bow Favour* to discharge the DCPD. For example, Dickie Wayne Schiesser, the OTH loadmaster, testified in his deposition, which was introduced at trial, that he had instructed the *Bow Favour* to start discharging the DCPD. Additionally, in a report, which was prepared by AP's own adjustor, Paul Foreman, and admitted into evidence, a time line of

---

6. AP does not challenge Hamre's testimony that he conducted an investigation and deter- mined that the *Bow Favour* did not err in discharging the DCPD.

events reflects that the dockman opened the cargo valve and "advised the ship that they could line up and start their pump." This report contained an additional statement that the adjustor had "found no evidence of *direct contribution from the Bow Favour*" and that the *Bow Favour's* mate "simply opened the manifold valve and started the deep-well pump on the tank containing the DCPD *when so ordered by the dockman*." (Emphasis added).

Other evidence, some of which was prepared directly by OTH, indicated that OTH personnel bore the responsibility for the contamination. For example, an OTH memorandum regarding the "root cause analysis" for the incident, which was introduced into evidence, included the following passage:

Interview with the dock operator responsible for the transfer, revealed he was involved with filling the lines earlier, prior to the ship's arrival. He was also the operator that conducted the pre-transfer conference, labeled the jetty line hoses and initiated the culprit transfer. The operator's statement indicates that he relied on his memory for labeling and hooking up the jetty line and he transposed the jetty line numbers for DCPD and MIPA–70. During an interview he admitted he did not walk out the lineup *prior to initiating the transfer* as is [OTH] strict policy.

(Emphasis added). This root-cause analysis also included the conclusion that the contamination "was the result of operator error," and it made no mention of the *Bow Favour*.

Finally, AP's own expert, Captain James Haley, testified that he had reviewed

Schiesser's deposition testimony. Haley understood Schiesser's deposition testimony as establishing that Schiesser had instructed the ship to start cargo operations. Recognizing that Schiesser's deposition and trial testimony conflicted, Haley explained that it appeared as if Schiesser was adamant at trial that he had not instructed the ship to start cargo operations and had simply misunderstood the deposition questions. Nevertheless, there was a significant amount of evidence presented at trial, in addition to the limited, challenged testimony provided by Hamre, that the *Bow Favour* had been instructed by shoreside personnel to start the discharge of the DCPD.

Additionally, we note that in closing arguments, Seachem's counsel emphasized Foreman's report, including the passage that the *Bow Favour* started to discharge as "ordered by the dockman." Seachem's counsel also emphasized Schiesser's own testimony that he had ordered the *Bow Favour* to start discharging the DCPD. Seachem did not place similar emphasis on Hamre's testimony concerning what his mate had told him. Accordingly, to the extent that the trial court erred in admitting portions of Hamre's testimony about what his mate on the *Bow Favour* had been instructed to do by OTH shoreside personnel, we hold that the error was harmless because such evidence was cumulative of a significant amount of more compelling evidence from OTH and AP representatives.[7]

We overrule AP's third issue.

### Apportionment of Liability

▬▬▬ In its fourth issue, AP argues that the trial court erred in instructing the

---

7. AP asserts in its reply brief that "the only admissible evidence before the jury was that the ship began pumping the contaminant ashore without warning to shoreside personnel." However, Schiesser, in his deposition testimony, and the above-cited reports, which were admitted into evidence, indicate that the *Bow Favour* had been instructed to start the discharge of the DCPD.

jury to apportion liability between Seachem and OTH because the jury charge's requiring of a "direct comparison of fault" between OTH and Seachem "in simple percentage fault numbers" "likely led to the erroneous result." AP complains that the trial court instructed the jury to apportion liability between OTH and Seachem over repeated objections and that the "allocation of fault and application of settlement credits between contract and tort defendants is not permitted."

▬▬▬ A trial court has broad discretion in submitting its jury charge, and we review a complaint regarding the submission of jury questions for an abuse of discretion. *In re D.R.*, 177 S.W.3d 574, 581 (Tex.App.-Houston [1st Dist.] 2005, pet. denied). On appeal, we reverse for error in the jury charge only, if after considering the record as a whole, including the pleadings, the evidence presented at trial, and the charge in its entirety, we conclude the error probably caused rendition of an improper verdict or probably prevented the appellant from presenting the case to the appellate court. *See* Tex. R.App. P. 44.1; *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex.2003); *Jordan v. Sava, Inc.*, 222 S.W.3d 840, 847 (Tex.App.-Houston [1st Dist.] 2007, no pet.). "Submission of an improper jury question can be harmless error if the jury's answers to other questions render the improper question immaterial." *City of Brownsville v. Alvarado*, 897 S.W.2d 750, 752 (Tex.1995). "A jury question is considered immaterial when its answer can be found elsewhere in the verdict or when its answer cannot alter the effect of the verdict." *Id.* "Submission of an immaterial issue is not harmful error unless the submission confused or misled the jury." *Id.* "When determining whether a particular question could have confused or misled the jury, we consider its probable ef-

fect on the minds of the jury in the light of the charge as a whole." *Id.* (citations omitted).

During the charge conference, AP generally objected to questions one and two of the jury charge on the ground that there should be "no apportionment." AP requested that the trial court modify these questions so that "the jury not be allowed to apportion liability between [OTH] and [Seachem]." The trial court overruled this objection, and, as set out above, submitted question number one, which asked the jury,

> Did the negligence, if any, of those named below proximately cause the contamination in question?
> a. Terminal [OTH]
> b. Bow Favour [Seachem]

The trial court also submitted, over objection, question number two, which provided,

> If you have answered "Yes" to Question 1 for the Bow Favour, then answer the following question. Otherwise, do not answer the following question.

> The percentages you find must total 100 percent. The percentages must be expressed in whole numbers. The negligence attributable to any one named below is not necessarily measured by the number of acts or omissions found.

> What percentage of the negligence that caused the occurrence do you find to be attributable to each of those listed below and found by you, in your answer to Question 1, to have been negligent?
> a. Terminal [OTH]
> b. Bow Favour [Seachem]

In response to the first question, the jury answered "Yes" as to OTH and "No" as to Seachem. Because the jury found that Seachem's negligence did not proximately cause the contamination in response to question number one, pursuant to the trial

court's instruction, the jury did not even consider question number two.

Thus, regardless of whether the trial court erred in naming OTH in the jury charge in question number one and in asking the jury to apportion negligence between Seachem and OTH in question number two, we conclude that any question in the charge requiring apportionment between Seachem and OTH "was plainly immaterial" in light of the jury's finding that Seachem's negligence did not proximately cause the contamination. *See City of Brownsville*, 897 S.W.2d at 752; *see also Hernandez v. Atieh*, No. 14–06–00582–CV, 2008 WL 2133193, at *4 (Tex.App.-Houston [14th Dist.] May 20, 2008, no pet.) (mem. op.) (holding that jury's finding that defendant was not negligent rendered erroneous submission of responsible third party immaterial because once jury found that defendant's negligence did not proximately cause the accident, its finding that responsible third party's negligence did cause accident "could not have altered the effect of the verdict").

Moreover, considering the charge in its entirety, the submission of OTH as a potentially negligent party "could not have misled or confused the jury" because the jury charge also included the instruction that "[t]here may be more than one proximate cause of an event." *See Hernandez*, 2008 WL 2133193, at *4. Specifically, the jury was instructed,

> "Proximate cause" means that cause which, in a natural and continuous sequence, produces an event, and without which cause such event would not have occurred. In order to be a proximate cause, the act or omission complained of must be such that a person using ordinary care would have foreseen that the event, or similar event, might reasonably result therefrom. *There may be more than one proximate cause of an event.*

(Emphasis added.) Based upon this instruction, the jury could not have been misled into believing that it had to choose between finding OTH or Seachem negligent. *See id.* Furthermore, in question number two, which the jury did not reach, the trial court specifically instructed the jury that it could only apportion liability as between those it had found to be negligent in response to question number one.

Finally, the record as a whole shows that the naming of OTH in question number one did not cause the rendition of an improper verdict because, throughout trial, both parties presented evidence that Schiesser, the OTH loadmaster, had made critical errors in writing the wrong line numbers through which the MIPA–70 and DCPD were to load and discharge and made additional critical errors in connecting the hoses in which the products were to be transferred. Seachem also presented evidence that Schiesser, or other shoreside personnel, had instructed the *Bow Favour* to discharge the DCPD and that Schiesser had admitted direct fault for the contamination immediately after the incident while on the scene. AP did not object or contend that the evidence pertaining to OTH's negligent acts was inadmissible or irrelevant during the trial. Rather, AP's only objection was to the reference to OTH in the jury instruction. Because one of Seachem's main theories at trial was that OTH bore responsibility for the incident, and because AP did not object to the evidence related to OTH's conduct, the jury would have been free to conclude that OTH's negligence caused the incident and to find that Seachem was not negligent, regardless of whether the jury charge contained any direct references to OTH.

Accordingly, we hold that the submission of OTH in question number one, and the submission of question number two

regarding apportionment, which the jury did not even consider in accord with its answer to question number one in the jury charge, did not constitute reversible error.

We overrule AP's fourth issue.

### Conclusion

We affirm the judgment of the trial court.