**Affirmed and Memorandum Opinion filed July 24, 2014.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-13-00206-CV

---

### SEMPRA ENERGY TRADING, LLC, Appellant

### V.

### RICHARD HOLMES, Appellee

---

**On Appeal from 127th District Court**
**Harris County, Texas**
**Trial Court Cause No. 2011-22519**

---

## M E M O R A N D U M   O P I N I O N

Sempra Energy Trading, LLC appeals a judgment in favor of appellee Richard Holmes. Sempra contends that the trial court erred in (1) overruling Sempra's "motions for judgment as a matter of law because there is not an enforceable contract to pay Holmes a $385,000 salary retroactive to January 1, 2008," and, alternatively, denying Sempra's motion for new trial because the evidence is factually insufficient to support the jury's verdict; (2) entering

judgment against Sempra on Holmes's claim for a 15 percent bonus because the evidence was insufficient to establish that Sempra promised Holmes a 15 percent bonus, and the evidence established a 10 percent bonus "as a matter of law;" (3) "denying Sempra's motions for judgment as a matter of law on [Holmes's] severance claim" because Holmes failed to sign Sempra's customary separation agreement and release; and (4) awarding attorney's fees to Holmes. We affirm.

## BACKGROUND

Holmes sued Sempra for breach of contract, quantum meruit, unjust enrichment, and promissory estoppel, alleging that Sempra failed to pay him the salary, bonus, and severance he earned pursuant to an oral agreement with Sempra. The trial court denied the parties' motions for summary judgment, and the case proceeded to trial. A jury trial was held from August 6, 2012 to August 9, 2012. The jury returned a verdict largely in favor of Holmes.

Evidence at trial established that Holmes was hired by David Messer in 1996 as a "nontraditional employee" to support and develop "new ideas in the commodity trading world" and "look at independent opportunities to start and run energy-related businesses." Holmes, Messer, Steve Prince, and three other individuals formulated a business plan, and Sempra eventually was formed in 1998. Messer as President and Prince as CEO ran Sempra ran from its inception until 2007. Sempra grew rapidly from 100 to 1,000 employees and became "wildly successful," making hundreds of millions of dollars in profits per year.

Holmes was a managing director at Sempra and president of six subsidiary companies; he had broad delegated authority from his bosses. He was paid a base salary and received bonuses based on how the businesses he ran performed. Over the years, Holmes was compensated well and received a percentage of the profits; Holmes's compensation and performance bonuses often were based on oral

2

agreements he made with Messer.

Sempra decided in December 2007 to shut down the synthetic fuel businesses Holmes had been running; after that time, Holmes no longer had any obligations toward Sempra.

Holmes and Messer met in January 2008 to discuss whether Holmes would be willing to manage the closing of the synthetic fuel businesses. According to Holmes, Messer knew that Holmes would not stay with Sempra for his then-yearly base salary of $225,000 because managing a wind-down of the synthetic fuel business would not give him an opportunity to earn large performance bonuses. Holmes testified that he kept his base salary low and did not receive raises for many years because he believed he should be paid based on performance.

Holmes testified that he and Messer agreed orally to reset Holmes's salary "consistent with [his] peers" effective January 1, 2008, and that Holmes would be paid a severance upon the closing of the synthetic fuel businesses. According to Holmes, he and Messer also agreed orally that Holmes would manage Sempra's interest in a coal company called Black Diamond.

Black Diamond went into bankruptcy and Sempra had interests associated with the bankruptcy proceedings after Black Diamond was unable to perform under long-term supply contracts it had with Sempra. Holmes testified that he was to receive 10 percent of any recovery from Black Diamond for his work in managing the bankruptcy matter and recovering as much of Sempra's interest in Black Diamond as possible.

Holmes testified that he did not reduce his agreements with Messer to writing because "that was not the culture of the company;" the culture was to honor oral agreements, and Holmes had a 15-year history of agreements with

3

Messer that were not documented.

Holmes started working on closing Sempra's synthetic fuel businesses and managing the Black Diamond matter after his January 2008 meeting with Messer. In the meantime, the Royal Bank of Scotland ("RBS") acquired a controlling interest in Sempra in April 2008, and Sempra's "company culture" started changing. RBS required more written documentation and there were "layers of approval even for CEOs."

Holmes approached Messer to ask about the salary increase after Holmes failed to receive an increase for several months. According to Holmes, Messer apologized in July 2008 for failing to "follow through" and explained that the salary increase had "fallen through the cracks." Messer explained that Sempra effectively had instituted a salary freeze. Messer also explained to Holmes that Sempra was going through "culture changes" and asked Holmes, "Do you want me to push this issue right now or can we deal with it later and I'll make you whole." Holmes testified that, based on their "long-term trust and relationship," he agreed that Messer could take care of the salary increase at a later time. Holmes continued working.

Holmes testified that he and Messer agreed in December 2008 that Holmes would receive 15 percent instead of 10 percent of any recovery from the Black Diamond matter because working on the matter took more time and effort than originally anticipated.

Messer left Sempra in late March 2009. Holmes testified that he talked to Sempra's general counsel Michael Goldstein in April 2009, and Goldstein "confirmed that all of David Messer's agreements would be met." Holmes testified that he had a discussion with Goldstein in July 2009 about "resetting" his salary. According to Holmes, he spoke with Goldstein and then-CEO Kaushik

4

Amin in January 2010 about his "salary situation;" Amin assured Holmes that his agreements with Messer would be honored, and Goldstein believed, "without checking more on numbers," that Holmes's salary should be reset in the range of $350,000 to $450,000.

Sempra raised Holmes's salary to $300,000 in March 2010 but the raise was not made retroactive to January 1, 2008. Holmes testified that he wanted to leave Sempra later in the year but could not reach an agreement regarding the salary amount, the effective date, or the percentage he should be paid from any Black Diamond recovery; negotiations were ongoing between Holmes and Goldstein.

In an email dated September 8, 2010, Goldstein explained Sempra's position regarding the salary and Black Diamond percentage because he believed that he and Holmes had come to an agreement:

> 1. Base Salary - Whatever conversations you may have had with David about base increases dating back to January 2008 did not result in increases at that time and the Company cannot now make those adjustments. I think I explained that to you earlier. Also, I understood between us that when we raised your base to 300k with Kaushik's approval that you were satisfied with that base salary adjustment in lieu of the above. That is the most we can do.
>
> 2. Black Diamond Offset - I agreed that we would honor your verbal agreement with David at his offer of 10% to reward you for your diligent work protecting the Company's interests in the multiple BD proceedings (I believe you agree with that based on footnote 5 to your memo). My proviso was that we could not pay you the full amount pending our negotiations with JPM, which is demanding a reduction in the purchase price for the coal book equal to some portion of the setoff amount. If we are forced to agree to that reduction (which I adamantly oppose and have conveyed that to Dan Hines), we will be in the same position as if we lost a portion of our setoff claim in the bankruptcy action or in a possible suit from CIT. Again, I think footnote 5 in your memo was getting to the same point, so I think we have general agreement on this point but obviously need to clarify the

details.

Holmes claimed that he never agreed to a $300,000 non-retroactive salary and 10 percent compensation for any recovery from the Black Diamond matter. Instead, Holmes testified he should have been paid a salary of $385,000 effective retroactively as of January 1, 2008, and 15 percent of any Black Diamond recovery.

Holmes also testified that, after he was told that Sempra required him to sign a separation agreement and release in December of 2010, he requested a copy of Sempra's separation agreement and release but was told that these documents could not be provided until his last day of employment. Holmes testified that no one at Sempra, including Messer, Goldstein, or Amin, ever mentioned that he was required to sign a separation agreement and release in order to obtain a severance. Messer testified that "[t]ypically, we would have some type of post-employment — some kind of document would go between us when we terminated someone." Goldstein was asked whether there was "any requirement on the part of Sempra where you either sign this agreement or you get no severance;" he said that "[i]n the early days, no, but I would say that in the later years, we — we would start insisting on some sort of an agreement . . . our standard form of severance agreement."

According to Holmes, the agreement and release Sempra eventually gave him incorrectly stated the salary amount and recovery percentage for the Black Diamond matter. Holmes also claimed that the release was too one-sided, too burdensome, and unfairly required him to waive any claims against Sempra. At trial, Holmes maintained that Sempra should have paid him a $385,000 salary because "[t]hat was a number consistent with the peer group as we've defined it and it is the number that Michael Goldstein recommended to the company that I be

6

paid." Holmes admitted that no one ever told him his salary would be reset precisely at $385,000; he was told that it "would be reset to [his] peer group." Evidence presented at trial established that other peer managing directors earned salaries between $192,000 and $385,000.

Goldstein, who had become co-CEO, asked Holmes in late 2010 for confirmation from Messer regarding the terms of Holmes's compensation "deal." In an effort to create a paper trail between Holmes and Messer, Holmes sent an email to Messer on February 15, 2011, the day he left Sempra:

> David,
>
> Today is my last day with RBS Sempra.
>
> There are a couple of things that I would like you to confirm for me. A simple response to this e-mail should work. My goal is to finish all outstanding matters ASAP and with your help confirming a couple of things, it lessens the chances of litigation and the need to then ask you to confirm things more formally through a deposition. Sorry. However, I don't think any of this is painful.
>
> One
>
> It was agreed during Q1 2008 that I would manage the orderly closing of the synthetic fuel business that stop[ped] the producing of synthetic fuel on December 31, 2007 and that I would take the lead position for the company in dealing with the Black Diamond Mining bankruptcy.
>
> Two
>
> I would have my base salary reset effective January 1, 2008. (FYI, my base salary was eventually reset.)
>
> Three
>
> It was agreed that I would be paid a percentage [of] any recoveries in the Black Diamond bankruptcy matter before the allocation of any expenses. The bid-ask spread between you and me was 10% to 15% of any recoveries but the final determination was not formally agreed in this 10% to 15% range and documented before your departure. My compensation downside protection was the defending of the offset and my upside was all other recoveries. All amounts would be paid in full

in cash.  What do you recall as being the final percentage that l would be paid?

(FYI. I purchased from JPMorgan the beneficial interest in the BD Unsecured Creditors Trust that was originally owned by Sempra Energy Trading.)

Four

It was agreed that an orderly end to my employment made the most sense (close down the synthetic fuel business during calendar year 2008, manage the Black Diamond matter through the plan of reorganization in July 2009 and then depart with severance).

I understand the request to confirm the above is a bit odd, but our old style of verbal agreements on relatively small matters is giving RBS Sempra concerns as they finalize matters with me.

I truly just want to be done with RBS Sempra and your help here may avoid litigation.

Best regards,

Rich

Messer responded to Holmes with a short e-mail on February 22, 2011, stating: "Rich, your email is as I remember everything, but I do not have a clear recollection as to where we ended up on #3.  Maybe that is because we didn't finalize this matter with all of the swirl of activity when I resigned."  Holmes forwarded his and Messer's email communications to Goldstein on the same day.  However, Goldstein had left Sempra on February 2, 2011.  Holmes was told to communicate with Brian Molinari of RBS,

Holmes sent a letter to Molinari on February 27, 2011, in which he explained his position regarding salary, the Black Diamond percentage, and severance terms.  In the letter, Holmes stated in pertinent part:

Two

Agreement: Holmes would have his base salary reset effective January 1, 2008.

8

Status: Holmes base salary was reset in 2010 after many discussions. No retroactive payment has been made. Disputed amount of retroactive pay is $167,308.

Details: Base salary increase promised with an effective date of January 1, 2008 was not actually increased until March 22, 2010. This was the 77th pay date for calendar year 2010 out of a total of 26 pay dates. Back due amounts are $75,000 for each calendar year 2008 and 2009 plus 6/26 multiplied by $75,000 for calendar year 2010. Total equals $75,000 plus $75,000 plus $17,308 ($167,308).

Three

Agreement: It was agreed that Holmes would be paid a percentage of any recoveries in the Black Diamond bankruptcy matter before the allocation of any expenses. The bid-ask spread between Messer and Holmes was 10% to 15% of any recoveries. The final determination was not formally agreed in this 10% to 15% range and documented before Messer's departure . . . . All amounts would be paid in full in cash.

Status: RBS Sempra has "approved" a payment to Holmes via the "2010 Bonus Plan" of $515,000. Holmes disputes the amount and the terms since the deal was to be paid in full and in cash (no deferral or claw back's, etc.). The deal between Messer and Holmes was done before the RBS deal with Sempra was closed. No concepts of the new compensation practices apply. Further it was a 2009 event and should already have been paid. To settle the dispute as to the percentage to be used, Michael Goldstein offered 10% with no reserves, adjustments or claw backs. Holmes offered to split the difference and use 12.5%, which Goldstein rejected.

*　　　　　*　　　　　*

Four

Agreement: It was agreed that an orderly end to Holmes employment made the most sense (close down the synthetic fuel business during calendar year 2008, manage the Black Diamond matter through the plan of reorganization in July 2009 and then depart with severance).

Status: All obligations of Holmes have been completed, except synthetic fuel business documents need to be sent to storage. There is no dispute regarding what was the Holmes mandate and that all obligations have been satisfied by Holmes. Holmes is owed money

and agreed to exchanging simple mutual releases. Sempra did not pay Holmes a salary of $300,000 or $385,000 retroactive to January 1, 2008. Sempra did not pay Holmes 15 percent of any recovery from the Black Diamond matter. Holmes never signed the separation agreement and release requested by Sempra.

Holmes sued Sempra on April 12, 2011. A day later, he sent to Sempra a signed separation agreement and release containing terms that differed from those in the separation agreement and release prepared by Sempra.

During trial, the court granted a directed verdict in favor of Sempra on Holmes's quantum meruit and promissory estoppel claims. After both parties rested, the jury answered questions in the jury charge as follows.

- The jury answered "$300,000/yr" in response to Question 1, which asked: "At the time Richard Holmes received his raise, what amount was agreed to by Richard Holmes and Sempra Energy Trading, LLC for Richard Holmes's yearly compensation?"

- The jury answered "Yes" in response to Question 3, which asked: "Did Richard Holmes and Sempra Energy Trading, LLC agree that Sempra Energy Trading, LLC would increase Richard Holmes's salary retroactively effective January of 2008?"

- The jury answered "15%" in response to Question 5, which asked: "What was the percentage of the Black Diamond recovery that Sempra Energy Trading, LLC agreed to pay Richard Holmes?"

- The jury answered "No" in response to Question 7, which asked: "Did Richard Holmes and Sempra Energy Trading, LLC agree that in order for Richard Holmes to Receive a severance payment that Richard Holmes

10

would have to sign the Separation Agreement and Release (Exhibit 5)?"

The jury awarded damages to Holmes for (1) "retroactive salary" in the amount of $162,500; (2) 15 percent of the Black Diamond recovery in the amount of $261,546.15; and (3) failure to pay a severance in the amount of $380,284. The jury awarded Holmes attorney's fees in the amount of $293,332 for "representation in the trial court" but did not award him any attorney's fees for representation on appeal.

Holmes filed a motion for judgment notwithstanding the verdict on November 12, 2012, arguing that the trial court should award him (1) an additional $4,315.08 in damages for Sempra's failure to pay his salary retroactively; and (2) appellate attorney's fees in the amount of $95,000.

Sempra filed a motion for judgment notwithstanding the verdict and alternative motion to disregard certain jury answers on December 4, 2012, arguing that (1) Holmes's breach of contract claims for "retroactive salary and 15% commission on Black Diamond are not supported by the evidence and the contrary was proven as a matter of law;" (2) the evidence conclusively established that Holmes is not due a severance; and (3) Holmes is not entitled to attorney's fees.

The trial court signed a "Final Judgment After Judgment Notwithstanding Verdict" on December 17, 2012. In the judgment, the trial court granted Holmes's motion in part and disregarded the jury's answer awarding Holmes $0 for contingent appellate attorney's fees. The trial court judgment awarded Holmes $95,000 in contingent appellate attorney's fees; the judgment otherwise mirrored the jury's damages and attorney's fees awards.

Sempra filed a motion for new trial on January 16, 2013, arguing that the evidence is legally and factually insufficient to support the jury's answers that the

parties agreed to a retroactive salary increase; agreed a 15 percent commission on the Black Diamond recovery; and did not agree that Holmes had to sign a separation agreement and release. Sempra argued that the evidence establishes that (1) Holmes agreed to a "non-retroactive salary increase;" (2) Holmes agreed to a 10 percent commission on the Black Diamond matter; and (3) there was no agreement on severance and a release of claims was a condition precedent for receiving severance. Sempra also argued that the trial court erred by submitting Question 1 through Question 8 to the jury.

The trial court denied Sempra's motion for new trial on January 29, 2013. Sempra filed a timely notice of appeal.

## STANDARD OF REVIEW

We review the denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict for legal sufficiency of the evidence. *See City of Keller v. Wilson*, 168 S.W.3d 802, 823 (Tex. 2005).

When reviewing the legal sufficiency of the evidence, we review the evidence in the light most favorable to the trial court's findings and assume that the court resolved all conflicts in accordance with its judgment. *Id*. at 820. We credit evidence favorable to the trial court's findings if reasonable factfinders could do so, and we disregard contrary evidence unless reasonable factfinders could not do so. *See id.* at 827. Evidence is legally insufficient if: (1) there is a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; or (4) the evidence establishes conclusively the opposite of the vital fact. *Id.* at 810. The ultimate test is whether the evidence at trial would enable reasonable and fair-minded people to reach the answer under review. *Id.* at 827.

12

For factual sufficiency review, appellate courts "must consider and weigh all the evidence, and should set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust." *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986).

Under both standards of review, the factfinder is the sole judge of the witnesses' testimony as well as the weight to be given to their testimony. *City of Keller*, 168 S.W.3d at 819; *GTE Mobilnet of S. Tex. v. Pascouet*, 61 S.W.3d 599, 615–16 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

## ANALYSIS

### I. Retroactive Salary

Sempra argues in its first issue that the trial court erred by overruling its "motions for judgment as a matter of law" because (1) "there is not an enforceable contract to pay Holmes a $385,000 salary retroactive to January 1, 2008;" (2) Holmes's breach of contract claim "for retroactive salary fails as a matter of law because the alleged contract is indefinite and lacks material terms (salary and effective date);" (3) the trial court erroneously submitted the "question of retroactivity separate from the question of whether Holmes was offered a salary of $385,000;" (4) there is an irreconcilable conflict between the jury's answers to Questions 1 and 3; and (5) Holmes agreed to a $300,000 non-retroactive salary as a matter of law.

Sempra argues in the alternative that "the evidence is factually insufficient to support the jury's verdict, and the trial court erred by denying a new trial." Sempra does not challenge the jury's answer to Question 1 that Holmes and Sempra agreed to a $300,000 salary at the time Holmes received his raise. Instead, Sempra challenges the jury's answer to Question 3 that Holmes and Sempra agreed his

salary increase would be retroactive to January 1, 2008.

### A. Contract to Pay a $385,000 Salary Retroactively

We begin by addressing Sempra's first contention that there is no evidence of an "enforceable contract to pay Holmes a $385,000 salary retroactive to January 1, 2008."

There is no jury finding of a contract to pay Holmes a "$385,000 salary retroactive to January 1, 2008." The trial court did not enter judgment reflecting such a finding. Instead, the trial court entered judgment on the jury's verdict that Sempra agreed to pay Holmes a $300,000 salary "retroactively effective January of 2008." Thus, Sempra's contention that there is no evidence of an enforceable contract for a $385,000 retroactive salary is irrelevant. Accordingly, we overrule Sempra's first issue with regard to this argument.

### B. Indefinite Contract Terms

Sempra argues that Holmes's breach of contract claim for a retroactive salary fails as a matter of law because the "alleged contract is indefinite and lacks material terms (salary and effective date)." Sempra further argues that the evidence does not establish an agreement on a definite salary and effective date.

Sempra's complaint was not raised in Sempra's (1) motions for directed verdict after Holmes rested and after the close of the evidence; (2) motion for judgment notwithstanding the verdict and motion to disregard several of the jury's answers; or (3) motion for new trial. *See End Users, Inc. v. Sys. Supply For End Users, Inc.*, No. 14-06-00833-CV, 2007 WL 2790379, at *3 (Tex. App.—Houston [14th Dist.] Sept. 27, 2007, no pet.) (To preserve a no evidence or matter of law point for appeal, a party must raise the complaint through a motion for directed verdict, a motion for judgment notwithstanding the verdict, an objection to the

14

submission of the question to the jury, a motion to disregard the jury's answer to a vital fact question, or a motion for new trial.) (citing *Cecil v. Smith*, 804 S.W.2d 509, 510-11 (Tex. 1991)); *United Parcel Serv., Inc. v. Tasdemiroglu*, 25 S.W.3d 914, 916 (Tex. App.—Houston [14th Dist.] 2000, pet. denied) (motion for judgment notwithstanding the verdict preserves a complaint that a legal principle prevents a party from prevailing on its claim); *see also B & W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 20 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Sempra did not raise these contentions during the charge conference.[1] Accordingly, we overrule Sempra's first issue with regard to this argument.

## C.    Charge Error

Sempra also argues that the trial court erroneously submitted the "question of retroactivity separate from the question of whether Holmes was offered a salary of $385,000" because "Holmes either proved his breach of contract claim for a retroactive $385,000 per year salary or he did not." According to Sempra, the trial court "invited the jury to create their own contract and impose it on the parties" by "submitting the issue of retroactivity [in Question 3] separate and apart from the amount of the salary" in Question 1.

A trial court enjoys broad discretion in framing a jury charge, and we review a complaint regarding the submission of jury questions for an abuse of discretion. *See Hatfield v. Solomon*, 316 S.W.3d 50, 62 (Tex. App.—Houston [14th Dist.] 2010, no pet.); *Air Prods. & Chems., Inc. v. Odfjell Seachem A/S*, 305 S.W.3d 87, 100 (Tex. App.—Houston [1st Dist.] 2009, no pet.). On appeal, we reverse for jury charge error only if, after considering the record as a whole, including the

---

[1] Sempra made one objection during the charge conference, which was overruled: "Well, we object to the entire charge being submitted because we don't think they've established that there are facts or evidence to support submitting a charge."

15

pleadings, the evidence presented at trial, and the charge in its entirety, we conclude that the error probably caused the rendition of an improper verdict or probably prevented the appellant from presenting the case to an appellate court. *Air Prods. & Chems., Inc.*, 305 S.W.3d at 100; *see* Tex. R. App. P. 44.1; *Wal–Mart Stores, Inc. v. Johnson*, 106 S.W.3d 718, 723 (Tex. 2003).

A trial court must submit in its charge to the jury all questions, instructions, and definitions raised by the pleadings and evidence. Tex. R. Civ. P. 278 ("The court shall submit the questions, instructions and definitions in the form provided by Rule 277, which are raised by the written pleadings and the evidence."); *Hyundai Motor Co. v. Rodriguez*, 995 S.W.2d 661, 664 (Tex. 1999). "The goal of the charge is to submit to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely." *Rodriguez*, 995 S.W.2d at 664. "Toward that end, the trial judge is accorded broad discretion so long as the charge is legally correct." *Id.*

Sempra preserved this point for appeal by submitting the following proposed question to the trial court at the charge conference: "Did Holmes and Sempra intend to bind themselves to an agreement that Holmes would be provided a raise to $385,000 per annum, retroactively effective January 1, 2008?" Sempra did not explain to the court why this question should be submitted to the jury instead of Questions 1 and 3 contained in the court's charge. The trial court refused Sempra's submitted question.

On this record, we reject Sempra's contention that the jury could only (1) agree entirely with Holmes and find that there was an agreement to increase his salary to $385,000 retroactive to January 1, 2008; or (2) agree entirely with Sempra and find that there was an agreement to raise Holmes's salary to $300,000 effective as of March 2010.

16

We reject this contention because the jury heard conflicting testimony regarding both (1) the amount of the salary increase; and (2) whether the salary increase was retroactive to January 2008.

Holmes testified that he was not willing to continue working for Sempra in January 2008 for his then-yearly base salary of $225,000 and wanted his salary "reset consistent with [his] peers" because managing a wind-down of Sempra's synthetic fuel business would not give him the opportunity to earn large bonuses. He testified: "The agreement that I reached with David Messer in January of 2008 was I would have my salary reset to my peer group with an effective date of January 1, 2008, and I would be paid severance upon the closing of the synthetic fuel business." Holmes also testified that he and Messer had a "discussion about dollar numbers, about title, both of those items; but in terms of the dollar number, it would have been a discussion that [the salary] would have been framed in the range of 350,000 to $450,000." Holmes confirmed several times that Messer told him that he "would receive a raise to [his] peer group in the range of 350 to $450,000 a year."

Sempra presented evidence that the salary range of Holmes's peers — other managing directors — was between $192,000 and $385,000. Holmes acknowledged that the $300,000 raise he was given was within the range of his peers. Sempra also presented evidence that it believed Holmes and Sempra had reached an agreement to increase Holmes's salary to $300,000 non-retroactively. Sempra introduced excerpts of Michael Goldstein's deposition testimony; Goldstein testified that he believed Holmes was satisfied with a non-retroactive salary increase to $300,000. Goldstein testified that he wanted to remind Holmes in his September 8, 2010 email to Holmes that he believed Holmes was satisfied with a non-retroactive $300,000 salary in lieu of a retroactive salary increase.

Sempra also introduced Holmes's email of February 15, 2011 to Messer in which Holmes told Messer: "FYI, my base salary was eventually reset."

Considering that the jury was presented with a salary range as well as conflicting testimony regarding whether Holmes and Sempra agreed to a retroactive salary increase, the submission of Questions 1 and 3 is supported by the evidence presented at trial.

Further, "submitting the issue of retroactivity [in Question 3] separate and apart from the amount of the salary" in Question 1 does not make the charge legally incorrect in light of the record before us. The charge "submitt[ed] to the jury the issues for decision logically, simply, clearly, fairly, correctly, and completely." *See Rodriguez*, 995 S.W.2d at 664. We therefore conclude that the trial court acted within its discretion when it submitted Question 1 asking about the agreed salary amount, and Question 3 asking about retroactivity of the agreed salary. Accordingly, we overrule Sempra's first issue with regard to its jury charge argument.

### D. Irreconcilable Conflict

Sempra asserts that an irreconcilable conflict exists between the jury's answers to Questions 1 and 3. Sempra asserts that the "jury cannot (based on the same evidence) accept the $300,000 amount (as they did) and, at the same time, award it retroactively" because that is not the "alleged contract Holmes sued upon."

"[I]f answers to jury questions are in conflict, an objection must be raised before the verdict is received so the court can 'provide the jury such additional instructions as may be proper, and retire the jury for further deliberations.'" *Beltran v. Brookshire Grocery Co.*, 358 S.W.3d 263, 268 (Tex. App.—Dallas

18

2011, pet. denied) (quoting Tex. R. Civ. P. 295). "Rule 295 provides a procedure for correcting conflicting jury answers." *Id*. The court must be made aware of the conflict before the jury is discharged because, once the jury is discharged, a conflict in the jury's answers cannot be reformed. *Id*. A timely Rule 295 objection preserves the issue for appeal. *Id*.

Because Sempra failed to raise this complaint in the trial court, its complaint is waived. Accordingly, we overrule Sempra's first issue with regard to this argument.

### E.    Acceptance of New Contract Terms as a Matter of Law

According to Sempra's brief, the evidence establishes that "Holmes agreed to a $300,000 non-retroactive salary as a matter of law" because (1) Goldstein "told Holmes in early 2010 that his salary would be raised to $300,000 *and this raise was in lieu of any retroactive increase*;" and (2) in his September 8, 2010 email to Holmes, Goldstein "confirmed the conversations he had with Holmes in early 2010 and stated again, in no uncertain terms, that the raise would not be retroactive." Sempra says Holmes had the choice of "accepting the new terms (*i.e.*, the $300,000 non-retroactive salary) or quitting," and Holmes accepted these new contract terms as a matter of law by continuing to work for Sempra after being informed by Goldstein that his $300,000 raise was in lieu of any retroactive increase.

The parties agree that Holmes was an at-will employee. "In employment at will situations, either party may impose modifications to the employment terms as a condition of continued employment." *Hathaway v. Gen. Mills, Inc.*, 711 S.W.2d 227, 229 (Tex. 1986). The party asserting the modification must prove that the other party agreed to modify the employment terms. *Id*. Generally, when the employer notifies an employee of changes in employment terms, the employee

19

either must accept the new terms or quit. *Id.* If the employee continues working with knowledge of the changes, then he has accepted the changes as a matter of law. *Id.* Thus, to establish a modification of an at-will employment contract, the party asserting the modification must prove two things: (1) notice of the change; and (2) acceptance of the change. *Id.*

To establish notice, an employer asserting a modification must prove that it unequivocally notified the employee of definite changes in employment terms. *Id.*; *Price Pfister, Inc. v. Moore & Kimmey, Inc.*, 48 S.W.3d 341, 350 (Tex. App.— Houston [14th Dist.] 2001, pet. denied). An employer must demonstrate that the employee had knowledge of the proposed modification, which requires proof that the employee knew both the nature of the change and the certainty of its imposition. *See Hathaway*, 711 S.W.2d at 229; *Price Pfister, Inc.*, 48 S.W.3d at 350. The employer asserting a modification also must establish that the employee accepted the proposed changes. *Hathaway*, 711 S.W.2d at 229.

Because no jury question was submitted on the issue of notification, and no objection was made to the omission of such a question, we must deem a finding in support of the trial court's judgment for Holmes unless notification was proven conclusively. *See id.* Here, unequivocal notification was not proven conclusively.

Sempra asserts that "[i]t is undisputed that Michael Goldstein, then CEO of Sempra, told Holmes in early 2010 that his salary would be raised to $300,000 and this raise was in lieu of any retroactive increase." Sempra does not provide a record cite to support its assertion, and we have found no support for this assertion in the record. Sempra also relies on Goldstein's September 8, 2010 email response to Holmes's email entitled, "FOR SETTLEMENT DISCUSSION PURPOSES ONLY Holmes – Sempra." Sempra says this email establishes unequivocal notification that any salary increase would not be retroactive.

20

Goldstein stated in his September 8 email:

Base Salary - Whatever conversations you may have had with David about base increases dating back to January 2008 did not result in increases at that time and the Company cannot now make those adjustments. I think I explained that to you earlier. Also, I understood between us that when we raised your base to 300k with Kaushik's approval that you were satisfied with that base salary adjustment in lieu of the above. That is the most we can do.

Holmes responded on September 16, 2010, stating that he had a "materially different view than the company positions [Goldstein] shared," and suggesting to "schedule a time to talk." Holmes explained his views, insisted that he was "promised a base salary increase effective January 1, 2008," and said he was assured in January 2010 that "promises made by David [Messer] would be honored." Goldstein replied four days later that he would review Holmes's email "with others so we can hopefully have a fruitful discussion next week."

The evidence also shows that Goldstein and Holmes continued to discuss various contract terms. Goldstein asked Holmes in late 2010 "for some sort of confirmation from Messer, David Messer, about what [Holmes] was saying the deal was." Holmes requested confirmation from Messer regarding various terms of agreements he and Messer had made. Holmes sent Messer's response to Goldstein but, by that time, Goldstein had accepted a different job and had left Sempra.

The evidence in this case does not establish that Holmes knew both the nature of the contract term changes and the certainty that such changes would be imposed so as to establish unequivocal notification. *See Hathaway*, 711 S.W.2d at 229; *Price Pfister, Inc.*, 48 S.W.3d at 350. Unequivocal notification of non-retroactivity is not established in light of (1) Goldstein's email telling Holmes that he would review Holmes's email with others and then continue discussions; (2) the

21

continued discussions that followed email exchanges between Holmes and Goldstein to settle differences; and (3) Goldstein's request that Holmes seek confirmation from Messer regarding the terms of Holmes's agreements. "Without proof of unequivocal notification, [Holmes]'s continued employment under protest did not equal acceptance as a matter of law." *See Hathaway*, 711 S.W.2d at 229. Accordingly, we overrule Sempra's first issue with regard to its argument that "Holmes agreed to a $300,000 non-retroactive salary as a matter of law."

## F.    Factual Sufficiency

Sempra does not present any argument regarding factual sufficiency of the evidence in its first issue, except for a general statement in the issue heading that "the evidence is factually insufficient to support the jury's verdict, and the trial court erred by denying a new trial." In its motion for new trial, Sempra did not challenge the jury's finding in Question 1 that Holmes and Sempra agreed to a $300,000 salary at the time Holmes received his raise. Sempra challenged the jury's finding in Question 3 in its motion for new trial and argued that (1) the "great weight and preponderance proves" that "Sempra and Holmes had agreed to a non-retroactive salary increase;" and (2) the evidence proves as a matter of law that Holmes agreed to a non-retroactive salary increase.

For the reasons discussed above, we reject Sempra's argument that Holmes agreed as a matter of law to a non-retroactive salary increase. In light of the record before us, we also reject Sempra's argument that the jury's finding in Question 3 is against the great weight and preponderance of the evidence.

Holmes testified repeatedly that he and Messer agreed his salary would be increased retroactive to January 1, 2008. There is no testimony or documentary evidence from Holmes that he and Sempra ever agreed to anything other than a retroactive salary increase.

22

Goldstein testified in his deposition that he tried to get Holmes a raise in 2009 to $385,000, but Kaushik agreed only to a $300,000 salary. Goldstein testified that he told Holmes a $300,000 salary had been approved by Kaushik, but he could not recall Holmes's reaction or any specifics of their conversations. Goldstein also testified that he sent an email to Holmes on September 8, 2010, because Holmes brought up his position that his salary increase should be retroactive and sent an email entitled "FOR SETTLEMENT DISCUSSION PURPOSES ONLY Holmes – Sempra" to Goldstein. According to Goldstein, his email was meant to convey his understanding that Holmes was satisfied with a non-retroactive "salary adjustment" to $300,000.

However, Holmes's September 16, 2010 response to Goldstein's email indicates that Holmes did not agree to a non-retroactive salary increase. Holmes (1) stated that he had a "materially different view than the company positions [Goldstein] shared;" (2) insisted that he was "promised a base salary increase effective January 1, 2008;" and (3) emphasized that he was assured in January 2010 that "promises made by David [Messer] would be honored." Goldstein replied that he would review Holmes's email and continue discussions later.

The evidence shows that Goldstein and Holmes continued their discussions. Goldstein also acknowledged in his deposition that he had asked Holmes in late 2010 for "confirmation from Messer, David Messer, about what [Holmes] was saying the deal was." This evidence does not negate the jury's finding that Holmes and Sempra agreed that Sempra would increase Holmes's salary retroactively.

Nothing in Messer's deposition testimony controverts Holmes's testimony and documentary evidence that Sempra and Holmes agreed that Holmes's salary increase was retroactive. Messer testified that he could not recall "details about the salary discussions" or "details about the retroactivity issue."

23

Based on the record before us, we reject Sempra's contention that the jury's finding in Question 1 was against the great weight and preponderance of the evidence. Accordingly, we overrule Sempra's first issue.

## II. Black Diamond Recovery Bonus

Sempra argues in its second issue that the evidence is insufficient to support the jury's finding in Question 5 and establish that Sempra promised to pay Holmes 15 percent of any recovery from Black Diamond. According to Sempra, the evidence establishes as a matter of law that Sempra promised to pay Holmes 10 percent of any Black Diamond recovery. We will discuss each contention in turn.

Sempra argues that Holmes's claim to 15 percent of any recovery from Black Diamond "rests solely on his testimony at trial that he reached a verbal agreement with Messer on this percentage in late 2008." Sempra says Messer disputed that he and Holmes reached such an agreement. Sempra argues that Holmes admitted in his February 15, 2011 email to Messer that no agreement for 15 percent had been reached between them.

Holmes testified repeatedly that he and Messer agreed in December 2008 that Holmes would receive 15 percent instead of 10 percent of any recovery from the Black Diamond matter because working on the matter took more time and effort than originally anticipated. The record does not support Sempra's assertion that Holmes admitted there was no agreement on 15 percent in his February 15, 2011 email to Messer.

After Goldstein requested in late 2010 that Holmes obtain confirmation from Messer regarding various terms of agreements he and Messer had made, Holmes sent Messer an email inquiring in pertinent part as follows:

Three

24

It was agreed that I would be paid a percentage [of] any recoveries in the Black Diamond bankruptcy matter before the allocation of any expenses. The bid-ask spread between you and me was 10% to 15% of any recoveries but the final determination was not formally agreed in this 10% to 15% range and documented before your departure. My compensation downside protection was the defending of the offset and my upside was all other recoveries. All amounts would be paid in full in cash. What do you recall as being the final percentage that l would be paid?

At trial, Sempra specifically questioned Holmes about whether he was confirming in his email to Messer that he and Messer never reached an agreement on 15 percent.

Q. This is in area No. 3.

A. Yes, sir.

Q. Are you not confirming that there was no agreement in that 10 to 15 percent range?

A. No, I am not.

Q. Okay. So reading the sentence, 'The final determination was not formally agreed to in this 10 to 15 percent range and documented before Mr. Messer's departure'?

A. Correct.

Q. That's what you write?

A. Correct. The key words there 'and documented.' It was agreed to, but it was not documented.

Q. Well, you were never going to document it, right? That's not how you did things?

A. Correct. We operated on oral agreements.

Q. So why were you anticipating documenting this one before his departure?

A. I wasn't. We had oral agreements. I had no need to document it based on the way we did business and our culture.

As this exchange makes clear, Holmes did not admit there was no agreement reached between him and Messer. Rather, Holmes testified that he and Messer

25

agreed to a bonus percentage but did not document their agreement.

Further, the evidence does not support Sempra's assertion that Messer disputed a 15 percent bonus. Messer never disputed the existence of an agreement between him and Holmes. Instead, Messer stated in response to Holmes's February 15, 2011 email that he "did not have a clear recollection as to where [he and Holmes] ended up on #3. Maybe that is because we didn't finalize this matter with all of the swirl of activity when I resigned." In his deposition, Messer testified that he could not remember the details of the spread and the percentage to which he and Holmes agreed. Messer never stated that 15 percent was an incorrect figure. Messer testified: "My recollection is that we said it would be in the range of 10 to 15 percent."

We conclude that the record contains sufficient evidence to support the jury's finding in response to Question 5. We overrule Sempra's second issue in that regard.

Sempra also argues that a 10 percent figure is established as a matter of law. Sempra asserts that (1) it notified Holmes in 2008, 2009, and 2010 that his bonus from the Black Diamond matter would be 10 percent; and (2) Holmes had the "choice of accepting the new terms (*i.e.*, the 10% bonus) or quitting." Citing *Hathaway*, 711 S.W.2d at 229, Holmes argues that the jury's finding in Question 5 "runs afoul of well-established law that by Holmes's electing to continue working, he accepted the offer of a 10% bonus as a matter of law."

The analysis of this argument tracks the discussion of Sempra's parallel contention that Holmes accepted a take-it-or-leave-it, non-retroactive raise to $300,000 by continuing to work at Sempra. Because there was no jury question submitted on the issue of notification and no objection to the omission, we must deem a finding in support of the trial court's judgment for Holmes unless

26

notification was conclusively proven. *See id.*

Sempra provides no record cite to support its contention that it notified Holmes in 2008 and 2009 that the bonus would be 10 percent, and we have found no support for this contention in the record. Sempra argues that it "gave additional notice to Holmes that the commission was 10% in the September 8, 2010 email" Goldstein sent Holmes.

Goldstein sent his email in response to Holmes's email entitled "FOR SETTLEMENT DISCUSSION PURPOSES ONLY Holmes – Sempra;" Goldstein stated as follows with regard to the Black Diamond matter:

> Black Diamond Offset - I agreed that we would honor your verbal agreement with David at his offer of 10% to reward you for your diligent work protecting the Company's interests in the multiple BD proceedings (I believe you agree with that based on footnote 5 to your memo). My proviso was that we could not pay you the full amount pending our negotiations with JPM, which is demanding a reduction in the purchase price for the coal book equal to some portion of the setoff amount. If we are forced to agree to that reduction (which I adamantly oppose and have conveyed that to Dan Hines), we will be in the same position as if we lost a portion of our setoff claim in the bankruptcy action or in a possible suit from CIT. Again, I think footnote 5 in your memo was getting to the same point, so I think we have general agreement on this point but obviously need to clarify the details.

No "take it or leave it" notification is reflected in Goldstein's statement followed by his conclusion that he "think[s]" that he and Holmes have a "general agreement on [the Black Diamond matter] but obviously need to clarify the details." Additionally, Goldstein sent Holmes an email on September 20, 2010, after Holmes disagreed with Goldstein's asserted positions, telling Holmes that he hoped to have a "fruitful discussion next week." The record shows that Goldstein and Holmes continued to have discussions with respect to different contract terms,

27

and Goldstein testified in his deposition that he asked Holmes in late 2010 to get confirmation from Messer "about what [Holmes] was saying the deal was."

This evidence cannot establish unequivocal notification that Holmes's bonus percentage would be 10 percent instead of 15 percent, considering Goldstein's September 8, 2010 email to Holmes and the fact that Goldstein continued to have discussions to settle the parties' differences. Nothing in this record establishes that Holmes knew that Sempra certainly would change the bonus percentage. Without proof of unequivocal notification, Holmes's continued employment does not constitute as-a-matter-of-law acceptance of the smaller bonus amount. *See Hathaway*, 711 S.W.2d at 229.

Accordingly, we overrule Sempra's second issue.

## III. Severance Payment

Sempra contends in its third issue that the "trial court erred by denying Sempra's motions for judgment as a matter of law on the severance claim."

Question 7 asked the jury: "Did Richard Holmes and Sempra Energy Trading, LLC agree that in order for Richard Holmes to receive a severance payment that Richard Holmes would have to sign the Separation Agreement and Release ([Defendant's] Exhibit 5)?" The jury answered "No." In response to Question 8, the jury awarded $380,284 as damages for Sempra's failure to provide a severance payment to Holmes.

Sempra contends that Holmes's severance payment claim fails as a matter of law because "he did not sign or accept" the "standard" or "customary" severance agreement presented to him by Sempra near the time of his departure. According to Sempra, Holmes failed to comply with a condition precedent to receipt of a severance payment when he refused to sign the "release required under the

28

December 9, 2010 letter offering him severance." Sempra says the "evidence at trial demonstrated the Separation Agreement and Release required Holmes, as a condition of being entitled to a severance payment, to sign the Separation Agreement and Release presented to him."

Sempra does not directly challenge the jury's "No" answer to Question 7; argue that the question is framed incorrectly; or argue that the trial court should not have submitted this question to the jury. Insofar as Sempra now suggests on appeal that the jury's "No" answer to Question 7 is immaterial because Holmes's acceptance of Exhibit 5 was a condition precedent to his receipt of a severance, this contention does not present a basis for disturbing the trial court's judgment based on this record and the jury's answer to Question 7 as submitted.

According to Holmes, he and Messer agreed in January 2008 that if Holmes was "willing to stay and manage the closing of the synthetic fuel businesses, [Messer] would increase [Holmes's] base salary and upon completion of the closing of the synthetic fuel businesses, [Holmes] would then earn a severance. So [Holmes] would be paid increased base salary and a cash amount or a severance dollar amount upon completion." When questioned further about his agreement regarding a severance payment, Holmes testified as follows:

> Q. . . . When Mr. Messer and you agreed back in January of 2008 about shutting down the business in exchange for a raise and a severance, did Mr. Messer indicate to you that you were going to have to sign a separation agreement and a release —
>
> A. No.
>
> Q. — to get the severance?
>
> A. No.
>
> Q. Was that ever discussed between you and anyone until December of 2010, the need to sign a release to get the severance?
>
> A. I don't believe anyone ever presented that as a condition to me.

29

My deal was with David and there was no condition to be signing any kind of piece of paper.

Q. When was the first time — we went through September — August and September e-mails with you and Mr. Goldstein. Did you ever have a discussion with Mr. Goldstein until 2011 about signing a severance agreement at all? Let me back up. Did you ever have any discussion with Mr. Goldstein at all about having to sign a severance agreement before you were going to get your severance?

A. Yes.

Q. When?

A. It would have been in the December/January time frame, December of 2010, January 2011 when I then became clear that there was talk about a document, some kind of document and I asked please let me have a copy of it, it was refused and then I would share my frustration with Michael, what's going on here.

Q. And we went through some of these e-mails a little while ago? Some of these e-mails with respect to the severance agreement?

A. Yes, I believe we did.

Q. Before the end of 2010, though, had Mr. Goldstein, Mr. Amin, or Mr. Messer or any executive at Sempra ever suggest to you that before you get a severance, you will have to sign a separation and release?

A. No.

Holmes also testified that when Messer left Sempra, Holmes asked Goldstein in March 2009 whether his "deals with Messer" would be honored; according to Holmes, "Goldstein confirmed to me all David Messer agreements with me would be honored and to keep doing what I was doing." Holmes further testified that "then CEO Amin, he and I discussed my agreements with David Messer and he agreed that all my agreements with David Messer would be honored, please don't quit."

On cross-examination, Holmes was questioned again regarding severance:

Q. Now, with respect to — let's talk about severance. Do you agree

30

that you were going to get the company's standard severance, you and Mr. Messer agreed to that, right?

A. Yes.

Q. And you understood that the way the standard severance was calculated, it was your function of your salary at the time of termination and your years of service, right?

A. Correct.

Q. And you understood that a release was typically required as a part of the standard severance agreement, right?

A. No.

Q. Okay. Well, you still have your deposition up there in front of you?

A. Yes.

Q. Page 106, I asked you this question, Line 19.

A. I'm sorry, I'm not there yet, sir. Page 106, Line 19.

Q. Yeah. 'You understood that it was the practice of Sempra when paying severance to pay the severance in exchange for the employee signing a release, right?' And you said, 'It was not uncommon for some sort of separation agreements to be put in place.' That's what you testified to, right?

A. Yes.

Q. And then on Page 107, Line 14, I asked you, 'You don't know of anyone who ever got a severance that didn't — that didn't sign the severance agreement, do you, at Sempra?' And you answered, 'I cannot sit here today and give you a name of an individual who got something, no, right?

A. Correct.

Q. So you understood that, again, severance typically required a release and you don't know of anybody who ever got a severance without signing a release, do you?

A. Nor do I know people who did sign releases. That was not my area in the company to know.

Goldstein confirmed that "in the early days" there was "not any requirement on the part of Sempra where you either sign this agreement or you get no severance" but

in the "later years" Sempra "would start insisting on some sort of an agreement."

With regard to severance, Messer neither confirmed nor denied that he and Holmes agreed that Holmes would have to sign Exhibit 5 in order to receive a severance payment. Messer testified: "If we had no other position for Mr. Holmes, then our practice would have been to terminate him with some type of severance arrangement." He also stated:

> Q. You were asked some questions about the customary severance offered by Sempra, and if I understood your testimony correctly, typically, prior to the purchase by RBS, the severance was based roughly on a monthly salary times years of service; is that correct?
>
> A. That is my recollection.
>
> Q. In addition, did the customary severance include the employee signing a release?
>
> A. Typically, we would have some type of post-employment — some kind of document would go between us when we terminated someone.

Richard Joers — who never was a Sempra employee, and who served as RBS's former "head of policy and employment" — testified that Exhibit 5 was a typical separation contract and release for Sempra and was "standard for what [Joers has] seen in the industry during [his] 30 years." Joers also acknowledged that "there is not a policy of RBS Sempra Commodities that requires a separation agreement;" instead "[i]t was a practice."

Based on the record before us, we reject Sempra's contention that the jury's "No" answer to Question 7 and its damage award in Question 8 must be disregarded because Holmes did not sign or accept the severance agreement that Sempra presented to him. Sempra's position regarding the necessity of a written severance agreement was disputed at trial. The evidence does not establish as a matter of law that Holmes was required to sign Exhibit 5 to receive a severance payment from Sempra.

32

Sempra further contends that "[t]o the extent Holmes claims that the agreement on severance was something other than an agreement that required he agree to the Separation Agreement and Release presented to him as a condition of receiving the severance payment, Holmes failed to prove the essential elements of that agreement." We reject Sempra's contention because the jury was asked only to determine whether Holmes was required to sign Exhibit 5 in order to receive a severance payment, and then to find damages based on the amount due for severance; the jury was not asked to answer any other question relating to severance payment.

Lastly, Sempra argues that Holmes is not entitled to a severance payment because he repudiated the proposed severance agreement he sent to Sempra in lieu of Sempra's offered agreement. Sempra does not explain how its argument relates to the jury's "No" answer to Question 7 or any other question submitted in the jury charge that it is trying to set aside. Additionally, we note that, even though Holmes signed a severance agreement and release he proposed, Sempra did not sign and agree to this proposed severance agreement and release. Therefore, there was no agreement that Holmes could have repudiated.

Accordingly, we overrule Sempra's third issue.

## IV. Attorney's Fees

Sempra argues in its fourth issue that the "only basis" for an attorney's fees award in this case is pursuant to Texas Civil Practice and Remedies Code section 38.001. Sempra contends that, "[s]ince Holmes's award and the trial court's final judgment must be reversed and rendered in favor of Sempra, there is no statutory basis for an award of attorneys' fees to Holmes."

Section 38.001(8) provides that a person may recover reasonable attorney's

fees from an individual or corporation, in addition to the amount of a valid claim and costs, if the claim is for an oral or written contract. Tex. Civ. Prac. & Rem. Code Ann. § 38.001(8) (Vernon 2008). To recover attorney's fees under this statute, a party must prevail on a breach of contract claim and recover damages. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 666 (Tex. 2009). Because Holmes prevailed on his breach of contract claims in the trial court and on appeal and recovered damages, he is entitled to attorney's fees under section 38.001(8). *See id*. Accordingly, we overrule Sempra's fourth issue.

## CONCLUSION

We affirm the trial court's judgment.

/s/     William J. Boyce
Justice

Panel consists of Justices Boyce, Christopher, and Brown.